May it please the court, I'm James Laughlin. I represent the appellee and cross-appellant Daniel Gradinariu. The only disputed issues arise in Gradinariu's cross-appeal, so the parties have discussed the matter and agree that I should speak first, if that's okay with the court. And with the court's permission, I'd like to reserve two minutes of my time. You may do so, but just watch the clock. There's no dispute here that the district court precluded defense counsel from cross-examining Marco Maguillon Sanchez, the government's key witness, about the 15-year mandatory minimum sentence he faced but for his cooperation. The questions presented to the court are whether its decision in U.S. v. Larson applies here, and if so, whether the court's error was harmless beyond a reasonable doubt. The government argues that Larson is limited to only those cases where the cooperating witness faced a mandatory minimum life sentence. Well, let's assume that that's an overstatement. What's bothering me here is not that issue, but the fact that the jury was told that this man was exposed to 18 years in prison. Isn't that true? No, it's not true. I think the government tries to suggest that the jury could draw an inference that that was the case, but when you actually look at the questions that were asked, for example, counsel would ask, so are you facing 18 years? He goes, oh, well, that's an example. Isn't that a pretty clear telegraphing of what's going on here? These jurors aren't babes in the woods, I don't think, are they? Well, Your Honor, as Your Honor knows, often when trial issues come up where we think something prejudices the jurors, we're always told that we always have to presume that the jury follows scrupulously all the instructions they're given, and they are given instructions that the questions of counsel are not evidence, and that's really what the government for the most part is pointing to, the questions of counsel mentioning certain periods of time, not the witness's answers. But would you agree that the jury knew that the witness was facing jail time and was testifying as a result of a hope that he would get lesser jail time by virtue of his cooperation? I agree to that, although the amount of time was not specifically stated. Now, that gets us back to U.S. v. Larson, and that is that in Larson, the majority concluded that there was error, confrontation clause error, in not permitting the question, aren't you basically beating a life sentence by agreeing to testify? But we ultimately concluded that there was harmless error with regard to the fact that the jury had been apprised of a sufficient amount of information to understand the bias of the two cooperating witnesses in testifying. Why shouldn't we reach the same result here? Well, Your Honor, I somewhat, I mostly agree with your categorization of Larson, but there's one thing that I disagree on. I believe that when it comes to the second witness, the witness who faced the life sentence, I believe his name was Lemare, the first part of the court's analysis said, well, was there sufficient evidence to gauge his credibility, despite the fact they didn't learn about the mandatory minimum, much the same way the government makes the argument here, and the court said no, no. They were advised that he had some bias, but they weren't advised of his magnitude, the magnitude of his motivation to lie because they didn't know how much time. But that establishes the first prong, right, that there was a confrontation clause violation. Right, and I think that might be linked to harmless error. Right, and then my understanding of the harmless error analysis, at least the way it was done in Larson, it was focused on the fact that the second witness, the witness that did not have the confrontation clause error, offered testimony against each defendant, and therefore the court was in a position to say, you know, we could take away Lemare entirely, and there's independent evidence to show that these defendants were guilty because Poitra testified against them, and there's this other evidence. We don't have that here. Maggie Owen was the key witness in this case against Gradanaro. He testified really to the only thing that mattered in this case, and that's whether when Daniel Gradanaro got in that car to drive to the Best Buy parking lot on May 8th, whether he knew he was getting involved in the middle of a drug deal. There was no dispute that he drove the car, and there was no dispute there was a drug deal there. The only question is what he knew. Victor Sanchez, the government's other cooperating witness, couldn't speak to that. He said that when he showed up at Mendez's house on the morning of the 8th to pick up the drugs, Mendez pushed or told Gradanaro to get out of the trailer before he would even start talking about the drug deal, and then once Gradanaro was gone, he described him as a freeloader. In fact, Sanchez testified that in the end, besides driving the car to the parking lot, he didn't see Gradanaro say or do anything that would make it look like he knowingly participated in a drug deal. So, therefore, the government's case really came down to Maggione. Maggione is a person who testified that in the weeks preceding May 8th, he and Gradanaro went on multiple drug deliveries together for Mendez, and that when they did that, Gradanaro knew exactly what they were talking about. Well, he did admit, your client admitted, did he not, in his post-arrest statement, that he had previously facilitated a drug transaction? Yes. He described it as a getting drugs for a friend. And then there were pay and owe sheets that were found in his wallet when he was arrested, and apparently he had a story for that, but I think we have to assume, I think Judge Hatter confirmed at sentencing that the jury obviously didn't believe him by virtue of his verdict. Possibly not. And I will agree that the ledgers or the slips of paper found in his wallet are probably of the things that the government points to as circumstantial evidence. Well, they're pay and owe sheets, aren't they? I mean, that's a fair characterization of them. They're names of people with amounts of money and quantities. Yes, Your Honor, but I would say that while it is circumstantial evidence, I think that if you look at the case without Maggione and with those slips of paper in his wallet, it doesn't... Without the slips of paper? No, and just with the slips of paper. If you have that evidence but you don't have Maggione... But what about his admission that he'd previously been involved in a drug transaction?  His admission was never that he sold drugs on behalf of Mendez, which is what he's accused of doing in this case. I thought his friend Robert or something came in a car and he was the go-between between the person in the car and Mendez for the drugs. Correct, Your Honor, and I think to us it may seem like it's a typical drug deal. What's untypical about it? I think what it was is I think the people who engage of meth use in that fashion often help each other procure a dose or two of drugs. I think what Mr. Gradinara said was... That's motivation. I mean, the law doesn't draw a distinction between facilitating a drug deal simply because you're a drug user yourself. He's doing it for somebody else. This isn't buying it for personal use. This is helping somebody else get drugs from Mendez. Correct, Your Honor, but I think that given the scenario that he described, that that does not provide compelling support for the government's theory about what happened on May 8th. Why wouldn't that show a predisposition under 404B that it was not a mistake or an accident that he happened to be in the wrong place at the wrong time? He'd previously been involved in arranging a drug deal. This was just a bigger drug deal the second time around. Again, I think that the difference is from Mr. Gradinara's point of view, which he explained to the jury, he just had a friend who wanted to know where he could get a small amount of meth. He asked around for people he knew, said, Oh, you can get it from him here. Let me take the money. I'll give him the money, give you the drugs. That is different from what the government wanted the jury to conclude, which was that he knowingly went into a high-level drug deal carrying a pound of meth. And a gun in the car in which his fingerprint was found. His fingerprints were not found on the gun, Your Honor. He was told that his fingerprints were found on the gun. Oh, I see. Okay, but that in fact was not true. The government didn't introduce fingerprint evidence, et cetera. No. But then didn't he admit that he'd handled the gun? When he was falsely told during his interrogation that they found fingerprints on the gun and they asked him how could he possibly explain this, he said a couple of days earlier he had been in a friend's house and he had handled some guns, so maybe that's how. Counsel, you're down to half a minute. You may want to reserve if you wish. All right, thank you. We'll hear from the government. Thank you, Your Honor. May it please the Court, I'm Kirby Heller and I represent the government. The sole question in this case, at least on the Larson issue, is whether the jury has sufficient evidence to assess the credibility of Maguillon or to put it another way, would they have come to a different conclusion about his credibility if they had known he faced a 15-year mandatory minimum sentence? The Maguillon testimony was the only link to this defendant, right, in this case? Well, perhaps the only direct evidence that the defendant knew that there were drugs. We certainly believe that there's plenty of circumstantial evidence that would support the jury's inference that he had that knowledge, even in the absence of Maguillon's testimony. And we believe that we certainly would have survived Rule 29 without his testimony and probably would have convicted him. Now, putting aside your contention that Larson is only directed toward life sentences, what's your response to counsel's point that the reference to 18 years was really not significant, it was really kind of an example, it didn't prove anything? Just to be clear, I don't know if I overstated it in the brief, I certainly didn't mean to suggest that Larson only applies to mandatory minimum sentences of life. That was the deciding factor in that case, but of course it remains to be seen how this court will deal with that issue in other cases. And just one more point about that, the court did say in Larson that it saw a fundamental difference between a mandatory sentence of life without any possibility of release and even a substantial prison term with a possibility of release. So that was what we were arguing. But as to the 18 years, there are many instances in which that number came about, and we're certainly not arguing that a lawyer's question is evidence, but when a jury is presented with the various examples of this, it was certainly free and supported reasonable inference to make, to draw the conclusion that at least the witness thought he was facing about 18 years without the motion. Let me go through the examples. Certainly. He first brings it up on his own. When they're talking about whether, why he cooperated, and he had some testimony that he and the defendant had both agreed they would cooperate to come out of this, head of the game, and then he says he doesn't think it would be right that he would get 18 years and that the defendant would only get 40 months. That was sort of an unsolicited statement. Again, would suggest to the jury that that's what he thinks he's facing. That's 339 and 340 of the record? I don't have that right in front of me. All right. That seems right according to my notes. Go ahead. Okay. And then the lawyer, the defense attorney, says to him, so you think you're looking at 18 years, and he says, yes, that's an example. But, again, you don't just pick a number out of thin air. Another time he says 18 years is fine with me because I know I screwed up. Again, this 18 years is weighing on him. And, finally, the defense attorney, in talking about why he's testifying the way he is against the defendant, says, so you told him that you were going to do what you had to do, which is, of course, give this testimony, because you have a family and you couldn't do 18 years correct. And, of course, he doesn't say no. He tries to explain what it is he told the defendant. And he says, I told him if you don't want to help me, how can I help you? I think all of that taken together and in context would suggest to the jury. So there are 14, excuse me, four references to 18 years in the record. Is that your contention? That's correct for that specific number. Then I should say that the defendant, in fact, testified that Maggie Owens said he was looking at a lot of time. And we also cite to the agent's questioning of the defendant, who was facing the same charges as was the witness, where he was discussing with the agent whether he pressured the defendant into confessing during a post-arrest statement. Ms. Keller, is there an exchange of testimony where the witness, Maggie Owens, is that the way you're pronouncing it? I don't know, Your Honor. That's how I've been saying it. I just call him McGowan. I was asked, now you're testifying here today under an agreement with the United States government. Is that true? Was that question asked? Yes, Your Honor. Essentially. Yes, yes. And he said that's right. That's correct. And then the question would be, does that agreement provide that if the government is satisfied with your testimony in this case, that you would be able to get or eligible for fewer years in prison? Yes, Your Honor. In essence, that was told to the jury. And, in fact, there's one fact further that came out before the jury, that he knew he had a mandatory sentence and that the only way to get out from that mandatory sentence was by a government motion. And that that was his deal that he, with the government, would consider doing that, depending upon how he testified in this case? Well, I'm not sure that that was the equation, that if he cooperated and if he told the truth, then that's that the government would file a motion. That the government would then file a motion for the reduction. Yes. So all of that was before the jury. Yes, Your Honor. And what Judge Hatter precluded was any reference to 15 years as the maximum mandatory minimum. Yes. As the mandatory minimum. Yes, Your Honor. That's really the size of that. So you would argue that the jury, apart from not learning about the 15 years as being the mandatory minimum, knew the basis for the fellow's testimony. And that was that if he testified in this case in a way that the government felt was appropriate or honest or whatever, he would be eligible for reduction in prison time. Yes, Your Honor. That was all before the jury. Absolutely. Now, if that is so, then there would be no constitutional violation by precluding the jury to consider 15 years was the mandatory minimum. Well, that's our position, Your Honor, that the jury certainly had sufficient evidence of his bias and his motivation for testifying. And whether they were told this particular number, 15, in the context of everything they were told, certainly wouldn't have made a difference. And, of course, the Court emphasized in Larson that the district court still retains a wide latitude to limit cross-examination so long as it's reasonable. You would argue there was no confrontation clause violation. Absolutely. Larson or no Larson. If there were a confrontation clause violation, however, you would argue it was harmless because there was other evidence apart from Gallen or whatever his testimony. Yes, Your Honor. Circumstantial evidence, I guess you would call it. Is that right? Well, again, there was no one who said, I talked to the defendant and he told me he knew we were doing a drug deal. And Maggie Young doesn't really say that. What was the other evidence? Well, first of all, we had him going to a drug deal. And although that doesn't definitively establish his knowledge, it's certainly something that's suspicious. Prior to the drug deal, that's what you're talking about? No, this one, the May 8th one. Oh, but he was there. He was driving the car. He's following somebody else's car. He parks right next to him. Right. You know, that's suspicious. But then we have other evidence that would support the knowledge inference. First of all, his name is in these drug ledgers. His nickname is Romano, and there are three instances of him having a connection with I believe it's 14 grams of methamphetamine in a couple of days right before this transaction. And whether Maggie Young testifies or not, those drug ledgers come in with his nickname, and certainly an agent could have testified and did testify as to what those ledgers meant. Secondly, he has drug records in his wallet. Third, he had the same cell phone, a cell phone with the same subscriber, as did Mendez, again suggesting a closer connection between the two than would otherwise be there. He admitted that he brokered a drug deal between his friend Robert and Mendez. Was that for 14 grams or something like that? Well, yes. I mean, in his testimony he was questioning whether 14 grams would in fact be sold for $120, but he admitted that, you know, it might have been 14 grams because that's what's in the drug records. And I should say that each instance of his distribution or his connection with the drug, Mendez's drugs in the days before this deal that were in the drug records, were charged in the indictment as overt acts. So the government's view was that this all was part of the same conspiracy. And finally, the jury could consider his testimony, which was quite incredible in finding that in fact he knew what was going on on May 8th. The jury is certainly entitled to make that inference. So that would be the formless error. Which is a rejection. I think when you said incredible, you mean not believable. Yes. Okay. Anything further, counsel? The only other point on the 18 years that I'd like to make is that in the summation, the defense counsel made exactly the same point that he would have made. So that's five times. Is that the fifth record? Well, that is an argument. That was the summation. But it was brought up again in his summation. All right. He said he testified the way he did because he knew he was going to get a lower sentence. And then he quotes Maggie Young and he says, it's not fair, I'm getting 18 years and he's getting less time. Okay. Thank you, counsel. Counsel, you have some, I think, less than a minute reserved. Very briefly, Your Honor, I just want to touch on the things that the government points to in the record where it asks the court to draw inferences and suggests that the jury drew inferences about the time Maggie Young is really facing. I don't think that that's a fair way to say that the jury got that information when it clearly runs contrary to the way our system works, which is it's the answers of the witness that are evidence. But it was the witness himself who mentioned the 18 years. And then immediately backtracked when counsel said, so you think you can do 18 years? He goes, no, no, that was just an example. Well, I mean, but the 18 years was clearly before the jury. I guess the question I have for you is when I was trying cases and I think probably as you all have been trying them, we've all been assuming that it's improper for the jury to consider the actual amount of time that the defendant might be facing. And the tension that Larson addresses is the problem in giving enough information to the jury to know that a testifying witness is facing substantial jail time and is hoping to get substantially less through cooperation without specifically giving the jury enough information to know what the defendant is likely to be facing if they return a guilty verdict, right? Correct. I think Larson addressed that in a footnote saying there's instruction available to deal with that. And don't we give the discretion to the district court to determine how far to go with specific numbers? I think within boundaries, and I think given Larson, I think that the court overstepped its boundaries in limiting it. And should have specifically allowed the defense counsel to get into the specific numbers that Magellan would say. Yes, a 15-year mandatory minimum. Thank you, counsel. The case just argued will be submitted for decision, and the court will have its recess. May I have a quick question? I'm sorry. I just want to confirm that the court got my supplemental filing on the expedited motion? Yeah. Well, wait a minute. Could you brief me on that? What is that? Tell us what that is. On May 21st, I filed with the court a supplement to a previously filed and granted motion to expedite. Oh, you want a decision quickly. Yes. Just to explain that Mr. Grodnaro tomorrow will be released from BOP custody to immigration custody, and the government's taking the position that he might not necessarily get credit towards his criminal sentence for any time in limbo he spends between tomorrow and when the court issues its decision. Well, now, we have this issue. Oh, excuse me. I'm sorry. Oh, I was going to say, don't we have this mandatory minimum issue, which apparently both sides have agreed it's a 10-year minimum. Is he not subject to that if we agree with you? Well, obviously, if the conviction gets overturned, he goes back for a new trial. But if not, he gets resentenced for the 10 years. What the government is saying is they will not agree that the time he spends in immigration custody will be counted towards his criminal sentence if the criminal sentence is bumped up. Well, now, is that issue pending in front of us in this case? No, but I want the court to be aware of it because, as I said, a quick decision by the court would be very much appreciated because each day he spends there. Yeah, it's very clear. I'm not sure we can address the other issue that you've been unable to resolve because I'm not sure what authority we have as an appellate court to tell the Bureau of Prisons how they're going to credit time in immigration custody. It seems to me that the best thing we can do for you is just get a quick decision out. You agree that we need to resentence because of the 10-year mandatory minimum that Judge Hatter should have imposed, right? Yes, if it's not going to be a reversal of the conviction. Assuming we affirm the conviction. I did notice in your blue brief that the projected release date is June 6, 2008, and it struck me as being odd, but I gather you've now explained that that release is then back to immigration custody. Right. And then what happens? What would normally happen under those circumstances? Well, his immigration case is on hold because this conviction provides the basis for deporting him. So until this conviction is final, his immigration proceedings can't go forward. But the BOP can't keep him because there's no longer a criminal sentence to hold him. So that's why he'll basically just sit in limbo in immigration custody until the appeal is resolved. Help me with the 70 months. He got a 70-month sentence, did he not? Yes, and he served a long time pretrial. This was a long pretrial case. Oh, I guess he got a lot of credit then. Yes. All right, because the actual conviction date was, what, within the last two years or so? Yeah. Right, okay. Yes. All right, I think we understand. I'd like to comment that I think you both argued this case very well, and it's a pleasure to have good lawyers like you before the court. So thank you both for your argument. I agree. I second that. The court will take its morning recess for about 10 minutes.
judges: Thompson, O'scannlain, Tallman